460 A.2d 824

**ESTATE of Rodman WANAMAKER, Deceased.**

**Appeal of Edwin P. ROME and the Executors of the Estate of Morton P. Rome, Deceased.**

Superior Court of Pennsylvania.

Argued Feb. 4, 1983.

Filed May 20, 1983.

178

Marvin Comisky, Philadelphia, for appellants.

Joseph W. Swain, Jr., Philadelphia, for appellee.

Before WIEAND, McEWEN and MONTGOMERY, JJ.

WIEAND, Judge:

The appeal in this case is from a final decree of the Orphans' Court Division of the Montgomery County Court of Common Pleas which refused to allow attorneys for Christopher G. Kellogg, a beneficiary of the trust estate of Rodman Wanamaker, deceased, to recover counsel fees from a fund created when the estate sold the stock of John Wanamaker, Philadelphia ("J.W.P.") to Carter Hawley Hale Stores, Inc. ("C.H.H.") for $60,000,000.00. This price produced, after taxes, a net of approximately $11,000,000.00 more than C.H.H.'s initial offer. The auditing judge found that legal services rendered by Morton P. Rome, Esquire, now deceased, and Edwin P. Rome, Esquire, although valuable to their client, had not contributed to the increased sales price and that their fees, therefore, could not be recovered from the trust estate. We affirm.

The general rule is that each party to adversary litigation is required to pay his or her own counsel fees. *Chatham Communications, Inc. v. General Press Corp.,* 463 Pa. 292, 300, 344 A.2d 837, 842 (1975); *Shapiro v. Magaziner,* 418 Pa. 278, 280, 210 A.2d 890, 892 (1965); *Hempstead v. Meadville Theological School,* 286 Pa. 493, 495, 134 A. 103, 103 (1926); *Harrison's Estate,* 221 Pa. 508, 70 A. 827 (1908). In the absence of a statute allowing counsel fees, recovery of such fees will be permitted only in exceptional circumstances. One of the exceptional situations in which counsel fees may be recovered is where the work of counsel has created a fund for the benefit of many. See: *Wilbur's Estate,* 334 Pa. 45, 72–74, 5 A.2d 325, 339 (1939); *Hempstead v. Meadville Theological School, supra.* This rule was stated by the Supreme Court of the United States in *The Boeing Co. v. Van Gemert,* 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980), as follows:

"[A] litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole.... The common-fund doctrine reflects the traditional practice in courts of equity ... and it stands as a well-recognized exception to the general principle that requires every litigant to bear his own attorney's fees .... The doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense." (Citations omitted).

*Id.* at 478, 100 S.Ct. at 749, 62 L.Ed.2d at 681–682. See also: *Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102 (3rd Cir.1976).

It is fundamental that an attorney seeking compensation from an estate has the burden of establishing facts which show that he or she is entitled to such compensation. *Hempstead v. Meadville Theological School, supra.* The allowance or disallowance of counsel fees rests generally in the judgment of the auditing judge, and his or her findings of fact, approved by the court en banc and supported by competent evidence, are binding on appeal. *Bennett Estate*, 366 Pa. 232, 237, 77 A.2d 607, 609 (1951); *Davidson Trust*, 354 Pa. 333, 335, 47 A.2d 145, 146 (1946). The judgment of the auditing judge regarding the allowance or disallowance of counsel fees will not be interfered with except for abuse of discretion or, as some cases express it, palpable error. *LaRocca Estate*, 431 Pa. 542, 548–549, 246 A.2d 337, 340 (1968); *Thompson Estate*, 426 Pa. 270, 281–282, 232 A.2d 625, 629 (1967); *Rambo's Estate*, 327 Pa. 258, 266, 193 A. 1, 4 (1937). Here, the auditing judge found that the services rendered by appellants had not contributed to the creation of the fund against which counsel sought to charge their fees. We turn, then, to a review of the evidence to determine whether the auditing judge committed palpable error.

■ The evidence discloses that on March 7, 1978, at a meeting of trust beneficiaries, the chairman of the trustees reviewed the difficulties being experienced in the retail trade by J.W.P. and reported that C.H.H. had expressed interest in purchasing J.W.P. in exchange for two million shares of common stock of C.H.H. and approximately $12,628,000.00 in cash. The trial court estimated the value of this offer to be $45,027,551.38. A majority of the beneficiaries expressed a willingness to sell on those terms. However, one of the beneficiaries, Christopher G. Kellogg, was strongly opposed and promptly contacted his attorney, Palmer K. Schreiber, Esquire. It was Schreiber who thereafter engaged Morton P. and Edwin P. Rome to assist him on Kellogg's behalf. Another beneficiary, also dissatisfied with the amount of the offer, invited Marshall Field and Co., another department store, to make an offer.

On March 15, 1978, the trustees executed a tentative agreement to sell the stock of J.W.P. to C.H.H.; and on April 3, 1978, the trustees filed a petition requesting a hearing to obtain Orphans' Court approval of the sale.[1] On that same day, April 3, 1978, Schreiber threatened the trustees with litigation if they continued their efforts to consummate the sale. Now, other trust beneficiaries also voiced objections to the sale, and at least four meetings between trustees, the trust beneficiaries and the respective counsel for the beneficiaries took place during April. On April 24, 1978, the offer of C.H.H., which by now was aware that interest had also been expressed by Marshall Field, was increased to $52,500,000.00, payable in cash. As a result of informal bidding between the two potential buyers, the C.H.H. offer was ultimately raised to $60,000,000.00, payable in cash. All beneficiaries except Kellogg signed consents to such a sale. Subsequently, Morton Rome and Schreiber conceived the idea of obtaining a stock option agreement from C.H.H. On May 1, 1978, the terms of the contract of sale were negotiated and accepted. A

1. Orphans' Court approval was required because the trustees had authority under the will to sell only for cash and only if ⅔ of the beneficiaries approved.

provision thereof gave the trustees the option of purchasing, on or before December 31, 1978, not more than 500,000 shares of C.H.H.'s common stock at a price of $18.50 per share. In fact, the option was never exercised, and it expired according to its terms.

The activities of Morton P. Rome and Edwin P. Rome, according to the facts found by the auditing judge, included the preparation of a complaint "for filing in the United States District Court for the Eastern District of Pennsylvania, seeking a temporary restraining order, preliminary injunction, and final injunction against the sale of the stock of J.W.P. to C.H.H. based on the alleged violation of federal and state securities law." (Trial Court's Opinion, p. 72). The petitioner named in the complaint was not Kellogg, however, and the complaint was never filed. Indeed, the trustees were not even aware that a complaint had been drafted. The court concluded, therefore, that these services by the Messrs. Rome had not contributed to the increased price paid by C.H.H. for the purchase of J.W.P.

The trial court found that the Messrs. Rome had also made efforts to find other purchasers for J.W.P. Most of these efforts, however, had been made after the offer of $60,000,000.00 by C.H.H. and acceptance by all trust beneficiaries except Kellogg. As such, the court found, they did not contribute to the realization of the increased price of $60,000,000.00. In any event, whether this work was done before or after the offer of $60,000,000.00 had been made, it is clear that the efforts of the Romes to find another purchaser were unsuccessful. Although we do not minimize the efforts made by appellants on behalf of their client, we are constrained to agree that this work must be paid for by Kellogg. Counsel's attempts to find another buyer did not contribute to the fund created by the increased C.H.H. offer; and the cost thereof should not be borne by the fund.

Kellogg's attorneys must be credited with conceiving of and negotiating the stock option agreement which was incorporated into and made a part of the sales agreement.

Ultimately, however, the stock option did not increase the funds available to the trust. On the contrary, it remained unexercised and eventually expired. Thereafter, it had no value. If, as appellants imply, the trustees committed an error of omission by failing to exercise the option at the time when the market price of C.H.H. stock temporarily exceeded the option price, the remedy lies in a separate proceeding. The fact remains that appellants' work in achieving a stock option did not increase the price paid for J.W.P., and the fees for this work cannot be collected from the price realized from the sale of the business.

Finally, there is evidence that the Messrs. Rome, or one of them, attended several meetings on behalf of their client. The trial court found, however, that their presence did not contribute in any identifiable way to the increased offer. Therefore, the court held, fees earned while representing Kellogg at such meetings could not be charged against the fund. The cost of these services was more properly charged to the client.

Because the auditing judge found that the increased purchase price had been the product of contributions made by several beneficiaries and their respective attorneys, appellants contend that they should not be penalized because their work was less fruitful or less glamorous than the work of several attorneys whose fees were allowed from the fund.[2] This contention does not support payment of appellants' fees from the fund. Rather, it suggests, as the courts of California have decided, that the "common fund" doctrine has no application where other primary beneficiaries or their attorneys have rendered services substantially the same or similar to those who seek compensation from the fund. It has no application, these courts hold, because in such instances no one party has been unjustly enriched at the expense of another. See: *In re Estate of Korthe*, 9 Cal.App.3d 572, 88 Cal.Rptr. 465 (1970); *In re Bullock's*

---

**2.** Palmer K. Schreiber, Esquire, who was primary counsel for Christopher G. Kellogg, was awarded a fee from the fund, as was counsel for the beneficiary whose efforts produced competitive bidding by Marshall Field. We express no opinion concerning these awards.

*Estate,* 133 Cal.App.2d 542, 284 P.2d 960 (1955). We find it unnecessary to determine whether, under such circumstances, the Supreme Court of Pennsylvania would follow the lead of California. In the instant case, the auditing judge found that the contributions of the several attorneys had not been equal. He found, in fact, that appellants' work had not contributed in any identifiable way to the creation of the fund. Appellants' services, although valuable to and payable by their client, were not chargeable against the fund.

The auditing judge's findings are fully supported by the evidence, and his determination that the fund should not be required to pay appellants' fees for services rendered at the behest of their client is consistent with established principles of law. The decree, therefore, will be affirmed.

Decree affirmed.

McEWEN, J., files a dissenting opinion.

McEWEN, Judge, dissenting:

While the careful analysis reflected by the opinion of the learned auditing judge is quite persuasive and the opinion of my eminent colleagues on this court is most compelling, I most respectfully dissent.

The auditing judge correctly found the ultimate sale price of $60,000,000.00 was $14,972,448.62 more than the value of the offer that a majority of the beneficiaries had agreed to accept. A study of the record leads me to the further conclusions:

That Christopher G. Kellogg, one of the beneficiaries, after a majority of the beneficiaries had found the original agreement acceptable, promptly retained counsel for assistance in an intensive campaign to thwart completion of the original agreement.

That Christopher G. Kellogg was vigorously represented and served well in that effort by all the counsel who represented him, namely, Palmer K. Schreibert, Morton P. Rome and Edwin P. Rome.

That the opposition of Christopher G. Kellogg to the original agreement was the catalyst for the quite substantial one-third increase in the sale price.

I would have determined, therefore, that the estate was responsible for the payment of such counsel fees as are due Morton P. Rome and Edwin P. Rome. The majority discusses quite thoroughly the policy exception that when the effort of a litigant or lawyer creates a fund for the benefit of many, counsel fees may be recovered from that fund. That principle is but one factor in my determination. A further factor is a general notion of fairness that such fees are here more appropriately paid by the fund than by the individual whose caution and prompt retention of able counsel effected the considerable increase in the fund.