## In re Estate of Clara H. Stover

C.P. of Bucks County, no. 55483.

*P.J. DiQuinzio,* for administrator.
*Frank S. Guarrieri, William Thatcher* and *Lawrence Barth,* for beneficiaries.

SOKOLOVE, *J.,* March 29, 1995—Pursuant to a settlement agreement among the interested parties, we entered a partial adjudication on January 5, 1994 of the first and final account of Milton D. Harte, admin-

istrator d.b.n.c.t.a. of the estate of Clara H. Stover. Three issues remained outstanding for our resolution: (1) Whether the Quakertown United Methodist Church, formed as the result of the consolidation of two residuary beneficiaries, is entitled to share in the residuary trust created by the decedent's will and, if so, in what proportion; (2) Whether the second attorney for the administrator is entitled to counsel fees from the estate; and (3) Whether counsel for the charitable residuary beneficiaries are entitled to fees from the estate. The parties have stipulated to the relevant facts and have submitted memoranda of law. We enter this adjudication to decide these remaining issues.

## FINDINGS OF FACT

(1) The decedent, Clara H. Stover, died on February 22, 1963, leaving a last will and testament dated July 10, 1962, which was admitted to probate by the Bucks County Register of Wills on February 28, 1963.

(2) The decedent disposed of the residue of her estate in item 29 of her will, which provided as follows:

"ITEM 29. All the rest, residue and remainder of my estate and the proceeds of the sale thereof, I give, devise and bequeath unto my trustee hereinafter named, in trust, nevertheless, to invest and reinvest and to pay the net income arising therefrom at least annually, and more often if expedient and practical to do so, to the Bethany Orphans Home at Womelsdorf, Phoebe Home at Allentown, the Board of Ministerial Relief under the Reformed Church in the U.S., the trustees of St. Stephen's Reformed Church at Perkasie, Pennsylvania, the Evangelical United Brethren Church at Quakertown, the Methodist Episcopal Church at Quakertown, and the Grandview Hospital, Sellersville, Pennsylvania, share and share alike. In the event that any of the chari-

table institutions named shall become dissolved or cease to operate, I direct the said annual income of said trust fund shall be divided, share and share alike, among the ones remaining."

(3) Bethel United Evangelical Church of Quakertown was officially formed on December 13, 1897.

(4) Bethel United Evangelical Church of Quakertown became associated with the national Evangelical Church, which resulted from the 1922 merger of the Evangelical Association and the United Evangelical Church.

(5) Bethel United Evangelical Church of Quakertown, in either 1933 or 1946, became Bethel Evangelical United Brethren Church of Quakertown when the Evangelical Church merged with the United Brethren in Christ.

(6) The Quakertown Methodist Episcopal Church was officially formed on September 20, 1872 and changed its name to the Quakertown Methodist Church in 1948 when it became affiliated with the national Methodist Church.

(7) On April 23, 1968 the National Conference of the Evangelical United Brethren Church and the National Conference of the Methodist Church merged to form the United Methodist Church.

(8) As a result of the national merger, Bethel Evangelical United Brethren Church of Quakertown changed its name to Bethel United Methodist Church of Quakertown, and the Quakertown Methodist Church changed its name to First United Methodist Church of Quakertown.

(9) The two churches operated completely separate until 1980, when the Eastern Pennsylvania Annual Con-

ference of the United Methodist Church appointed one minister to serve both congregations.

(10) As of December 1983, Bethel United Methodist Church had a membership of approximately 191, and First United Methodist Church had a membership of approximately 341.

(11) In May 1984 the congregations of the two churches properly voted to consolidate into one congregation, to be known as the Quakertown United Methodist Church. The members of each congregation automatically become members of the new congregation.

(12) On November 8, 1984, the officers of Bethel United Methodist Church and First United Methodist Church signed articles of consolidation, which were duly filed, along with a plan of consolidation, with the Pennsylvania Department of State. The registered office of the consolidated corporation was the address of the former First United Methodist Church. The plan of consolidation stated that the "Corporation shall be organized and operated as a non-profit corporation for purposes exclusively religious, charitable, literary and educational ..., and in furtherance thereto the corporation shall, inter alia; support and promote public worship and benevolences according to the faith and usage of The United Methodist Church. ..."

(13) Quakertown United Methodist Church had approximately 526 members as of December 1984 and approximately 492 members as of December 1985.

(14) The record membership of Quakertown United Methodist Church dropped by 57 members to 435 as of December 1986, primarily because of the departure of some members of the former Bethel United Methodist Church upon the consolidation.

(15) In early 1987, the property of the former Bethel United Methodist Church was sold.

(16) Quakertown United Methodist Church had approximately 461 members as of December 1987.

(17) The property of the former First United Methodist Church, where the consolidated congregation had continued to meet temporarily, was sold in 1988, and the Quakertown United Methodist Church relocated to a new property on Freier Road in Milford Township, Pennsylvania.

(18) The executor named in the decedent's will and appointed by the register of wills died before completing the estate administration. Letters of administration d.b.n.c.t.a. were then granted to Milton D. Harte on July 19, 1965.

(19) Mr. Harte did not finalize the estate administration in a timely and appropriate fashion.

(20) Nothing occurred on the record in this matter until September 28, 1987, more than 24 years after the decedent's death and 22 years after Mr. Harte's appointment, when Mr. Harte's prior attorney filed a petition for counsel fees and for leave to withdraw. The petition alleged that the attorney had tried for many years to obtain the necessary information from Mr. Harte so as to prepare an account but that Mr. Harte had been uncooperative.

(21) Another attorney filed an answer on behalf of Mr. Harte to the petition.

(22) Thereafter, on January 14, 1988, attorney P.J. DiQuinzio entered his appearance for Mr. Harte.

(23) Mr. DiQuinzio filed a first and final account of the estate's administration, stated to December 31, 1987, on August 24, 1988.

(24) The account showed principal receipts of $155,753.11, with a net gain on sales or other dispositions of $63,399.80, for a gross estate of $219,152.91. The principal consisted primarily of cash and securities, along with one piece of real estate.

(25) The account showed that $7,000 had been paid in executor's commissions to F.W. Conrad, $3,059.66 had been paid in administrator's commissions on income to Mr. Harte and $2,750 had been paid in counsel fees to the prior attorneys representing the estate.

(26) The account also showed that substantial portions of the estate's funds had been invested at various times between 1975 and 1981 in notes and mortgages with business entities and individuals.

(27) The account was presented for audit on October 3, 1988.

(28) Objections to the account were filed by all the charitable remainder beneficiaries.

(29) Phoebe-Devitt Homes, Bethany Children's Home, Pension Boards United Church of Christ, St. Stephen's United Church of Christ and Grandview Hospital, represented by the law firm of Curtin & Heefner, filed 50 objections to the account and later filed an additional five objections.

(30) Quakertown United Methodist Church, represented by the law firm of Biehn & Thatcher, which later became Grim, Biehn, Thatcher & Helf, filed seven objections to the account.

(31) All of the charitable beneficiaries objected to the loans made by the estate and to the failure to account for all of the estate's assets.

(32) The five beneficiaries represented by Curtin & Heefner also objected to the payment of trust income to Bethel United Methodist Church, Evangelical United

Brethren Church at Quakertown and Quakertown United Methodist Church.

(33) After a routine conference on the objections, Mr. DiQuinzio revised and restated the account, and hearings ensued, beginning March 9, 1989 and continuing on April 20, 1989.

(34) Mr. Harte, represented by Mr. DiQuinzio, testified at these hearings. The evidence revealed that Mr. Harte had advanced large amounts of estate funds to business entities in which he was personally involved, without proper notes or individual guaranties. He never demanded payment of the loans and continued to make further advances when no interest payments were being made. The advances were made using several different names and deposited into different accounts, including Mr. Harte's.

(35) Mr. Harte also gave $30,000 of estate funds to his daughter and son-in-law in return for a mortgage on their residence. The mortgage was satisfied when the residence was sold. Mr. Harte claimed that he had loaned $43,900 of estate funds to his daughter and son-in-law by writing estate checks to himself and giving the money to them.

(36) At the conclusion of the April 20, 1989 hearing, during cross-examination of Mr. Harte, we stated on the record that Mr. Harte had obviously engaged in self-dealing in the administration of the estate, and we directed that a copy of the notes of testimony be delivered to the district attorney for possible criminal investigation.

(37) After delays occasioned by Mr. Harte's promises to collect the outstanding loan from his daughter and son-in-law, the matter was scheduled on Mr. DiQuinzio's motion for November 20, 1989 to enable the objecting beneficiaries to finish their cross-examination of Mr.

Harte. Mr. DiQuinzio appeared, but despite ample notice, Mr. Harte did not.

(38) The hearing was continued to February 5, 1990, at which time a rule was returnable for Mr. Harte to show cause why he should not be held in contempt. Upon motion by the beneficiaries, Mr. Harte was directed to place all estate funds into a restricted account.

(39) On February 5, 1990, Mr. Harte again failed to appear.

(40) Mr. DiQuinzio petitioned to withdraw as counsel for Mr. Harte, citing irreconcilable differences.

(41) The estate's known bank accounts were frozen at the beneficiaries' behest.

(42) On February 13, 1990, we issued an attachment for Mr. Harte for March 7, 1990.

(43) On March 7, 1990, Mr. Harte again failed to appear. The surety on his administrator's bond, Maryland Casualty Company, petitioned to intervene. A further attachment for Mr. Harte issued.

(44) Mr. Harte finally appeared on March 14, 1990, represented by criminal counsel. Upon questioning by the beneficiaries' counsel, he invoked his rights under the Fifth Amendment to the U.S. Constitution. We permitted Mr. DiQuinzio to withdraw, and he filed a petition for advanced costs and counsel fees.

(45) The record was closed on July 3, 1990, and the parties entered into settlement negotiations.

(46) The estate did not collect on the loans to the business for which Mr. Harte had worked, nor on the alleged loan to Mr. Harte's daughter and son-in-law.

(47) By the settlement reached and incorporated into our partial adjudication, Mr. Harte paid $50,000 to the estate, and the surety, Maryland Casualty Company, paid $80,000 to the estate. The parties agreed that the

estate had a balance on hand of $175,940.07 as of November 23, 1992.

(48) Mr. DiQuinzio's bill, reflecting the time he spent on this matter, was submitted as part of his petition and as an exhibit to the parties' settlement agreement. The bill reflects costs of $764.50, which was to be paid pursuant to the settlement agreement and partial adjudication.

(49) Mr. DiQuinzio's bill reflects that he spent a total of 186.75 hours on this matter from December 10, 1987 through March 14, 1990. He charged $150 per hour for 1987, $160 per hour for 1988 and 1989 and $180 per hour for 1990. His total bill for services rendered, exclusive of costs, is $30,187.50.

(50) Until the audit, Mr. DiQuinzio's efforts were made in the interest of the estate and its beneficiaries. Thereafter, much of the time he spent was on behalf of Mr. Harte individually, in responding to the beneficiaries' well-founded objections to Mr. Harte's mishandling of the estate administration.

(51) Mr. DiQuinzio's services in reconstructing 25 years of the estate administration, in stating the account and revising it in response to the objections filed, in investigating the administrator's bond and in working toward the prompt resolution of this matter despite Mr. Harte's contemptuous conduct, were of great benefit to the estate. The settlement reached by the parties, which added $130,000 to the estate's coffers, is directly attributable to Mr. DiQuinzio's professionalism and diligence.

(52) Mr. DiQuinzio reasonably expended 100 hours of his time on behalf of the estate.

(53) During the period of 1987 through 1990, the reasonable hourly rate for an attorney of Mr. DiQuinzio's

experience performing the services rendered to this estate in Bucks County was $125.

(54) Grim, Biehn, Thatcher & Helf, formerly Biehn & Thatcher, billed its client, Quakertown United Methodist Church for a total of 140.2 hours at hourly rates of $50 and $62.50 (one-half of its normal fee) for this matter. The services were rendered primarily by an associate of the firm, David W. Midkiff. At least 20.3 hours of this time was spent solely for the benefit of the one client in pursuing its income interest in the residuary trust. Mr. Harte paid $786 by order of court as the result of his contempt, leaving a balance of $6,991.75.

(55) Curtin & Heefner charged a total of $19,335 for services rendered on behalf of its five beneficiary clients. The services were rendered by one partner and one associate at a reduced rate of $75 per hour. The total time spent by the attorneys was 257.8 hours, but it is impossible to tell how much time was spent solely for these clients without benefiting the estate as a whole because the firm's bill does not designate the amount of time spent for each itemized service.

## DISCUSSION

The first question before us is the effect of the consolidation of the two charitable trust beneficiaries, Bethel United Methodist Church, formerly Bethel Evangelical United Brethren Church, and First United Methodist Church of Quakertown, formerly Quakertown Methodist Church, into Quakertown United Methodist Church. Although the circumstances presented are novel, our decision is guided by fundamental principles of law.

In general, where a devise or bequest is made to a charitable corporation that either before or after the

death of the testator has been consolidated with another corporation, or has been merged into another corporation, the consolidated corporation or that into which the other has been merged will be entitled to receive the property, as a *matter* of law, unless the testator manifested a different intention. IV A Austin W. Scott & William F. Fratcher, The Law of Trusts §397.3, p. 433 (4th ed. 1989); Restatement (Second) of Trusts §399, comment o (1959), quoted in *Bodine Trust,* 429 Pa. 260, 239 A.2d 315 (1968). The Pennsylvania legislature codified this precept in the Nonprofit Corporation Law of 1933, as amended, providing that

"Any devise, bequest, gift or grant contained in any will or other instrument, in trust or otherwise, made before or after such merger or consolidation, or for any of the constituent corporations, shall inure to the surviving or new consolidated corporation, as the case may be." 15 P.S. §7809.[1]

---

1. The Nonprofit Corporation Law of 1933 was repealed by the Nonprofit Corporation Law of 1972, and 15 P.S. §7809 was replaced by 15 Pa.C.S. §7929, subsequently renumbered, effective October 1, 1989, to 15 Pa.C.S. §5929. 15 Pa.C.S. §5929 makes the continued gift to the surviving or consolidated corporation subject to compliance with the requirements of 15 Pa.C.S. §5550 (formerly 15 Pa.C.S. §9552). Section 5550 sets forth in pertinent part that a devise, bequest or gift to a nonprofit corporation which has become a party to a consolidation after the execution of the donative document is effective only as a court of competent jurisdiction may order under the Estates Act of 1947 (repealed and recodified at 20 Pa.C.S. §§6101-6117, which includes the *cy pres* doctrine at section 6102). Because the Nonprofit Corporation Law of 1972, with the additional reference to the *cy pres* doctrine, was enacted after the execution of the decedent's will as well as her death, it is not applicable to our construction of her charitable remainder trust. *Leffmann Trust,* 378 Pa. 128, 105 A.2d 115 (1954). Even if we were to utilize the Law of 1972, for the reasons discussed below, the *cy pres* doctrine would not apply.

We must, therefore, decide whether the decedent manifested an intent that the income interests of the former "Evangelical United Brethren Church at Quakertown" and the "Methodist Episcopal Church at Quakertown" in the remainder trust not pass to the Quakertown United Methodist Church resulting from their consolidation. The decedent's will states that, "(i)n the event that any of the charitable institutions named shall become dissolved or cease to operate, I direct that the said annual income of said trust fund shall be divided, share and share alike, among the ones remaining." Accordingly, the decedent indicated an intent that the consolidated church not receive the consolidating churches' shares if, as the result of the consolidation, the former churches have dissolved or ceased to operate.

While the two predecessor churches no longer exist as separate nonprofit corporations under the technical terms of the Nonprofit Corporation Law, 15 Pa.C.S. §5929(a), we do not believe that they have "dissolved" or "ceased to operate" within the meaning of the decedent's will. We have reviewed numerous cases involving the merger or consolidation of a charitable beneficiary with another charitable organization which was not named as a beneficiary. We recognize that the consolidation of two named beneficiaries here presents a unique factual situation, not previously addressed by the courts of this Commonwealth. Nonetheless, the other cases are helpful in interpreting the language employed by the decedent in light of the facts which have developed after her death.

In *Davis Trust,* 47 D.&C.2d 184 (C.P. Washington Co. 1969), the decedent had established an inter vivos trust with the income payable after his death to "Washington and Greene Counties Council no. 720 Boy Scouts

of America, for so long as the said council shall be in existence. In the event that the said council no. 720 shall be dissolved or discontinued, then in that event the trustee is directed to pay the said net income from the trust property, semi-annually to the First Presbyterian Church of Washington." *Id.* at 185. After the decedent's death, council no. 720 changed its name to reflect the addition of territory to its district. A little later, council no. 720 merged[2] with the Allegheny Council to form the Allegheny Trails Council, Boy Scouts of America.

In ascertaining the proper trust beneficiary between the merged Boy Scouts Council and the Presbyterian Church named as the alternate, the orphans' court found that, in spite of the name change and the addition of territory, the surviving corporation continued to carry out the terms of the trust in accordance with the settlor's intent. The settlor intended to benefit the Boy Scouts generally and his home district specifically so that his charitable purposes were not frustrated by the merger. The court reasoned that there was no real dissolution of the original scouting council in the merger because "(b)oth organizations continue to exist in the merged unit." *Davis Trust, supra* at 189. As the named council had not been "dissolved or discontinued" within the meaning of the trust indenture, the court ordered the trustee to distribute the trust income to the merged scouting unit.

The testatrix in *Arnold's Estate,* 56 D.&C. 662 (O.C. Lackawanna Co. 1946) had made several charitable bequests in trust, including one to her church, the Methodist Episcopal Church of South Canaan. With respect to the charitable gifts, the testatrix's will further stated

2. The "merger" in *Davis Trust* was actually a consolidation, as here, since two corporations joined to create a new one.

that "in case any of the above institutions above named shall cease to exist and the corporation shall be dissolved and as I have not heretofore set the disposition to be made of the legacy given and bequeathed to such institution in trust, then and in such case the said legacy shall be deemed to have lapsed and the same shall revert to my estate and held and direct that the same shall be disposed of among my heirs, in the same manner as if I had died intestate." *Id.* at 663-64. Seventeen years after the testatrix's death the South Canaan church merged into the neighboring and closely associated Methodist Episcopal Church of Waymart. The governing body of the two churches passed a resolution effecting the discontinuance of the South Canaan church and its merger with the Waymart church. The property and records of the South Canaan church were transferred to the Waymart church. All members of the constituent churches became members of the combined church which continued the same religious and charitable work in the same places as before.

In construing the will, the *Arnold's Estate* court concluded that the South Canaan church had not "ceased to exist" within the meaning of the will by merging with the Waymart church. As the court explained,

"To merge means to combine. 'It suggests a joining together, an addition, a combining of the qualities of one with another; *not a death, but rather a marriage.'*... The two churches here joined forces combining all that each had under the name of one. There was no extinction or 'ceasing to exist' of either of them. The parishioners were the same, the religious purposes and services were the same, the minister was the same and if testatrix were living she would have the same interest in the new church as in the old. While the physical building may have 'ceased to exist' as a church the 'church' as an 'institution' of worship continued in the new and

more modern structure in Waymart. The merger was not a cessation of the ... religious purposes carried on formerly under the name of South Canaan Methodist Episcopal Church. The work of the church was continued by its officers and members under the new name in the Waymart church." (emphasis in original) (citation omitted) *Arnold's Estate, supra* at 667.

The Pennsylvania Supreme Court affirmed the lower court's analysis of the meaning and effect of more precise testamentary language in *Leffmann Trust,* 378 Pa. 128, 105 A.2d 115 (1954). There, the decedent, during life, had executed a deed of trust providing for the payment of income, after his and his wife's deaths, to three charities. The trust directed that if any of the named charities ceased to have "a separate corporate existence," then that charity's share was to be divided equally among those remaining to have a separate corporate existence. Over 20 years after the decedent's death, one of the charities, the Jewish Hospital Association of Philadelphia, was consolidated with two other hospital associations to become the Albert Einstein Medical Center. The Supreme Court held that the decedent's use of the phrase "separate corporate existence" excluded Einstein Medical Center from participating in the trust distribution. Pursuant to the nonprofit corporation law then in effect, the consolidation eliminated the separate corporate existence of the named charitable beneficiary. The court concluded that where the decedent had denominated a charitable beneficiary in such an explicit fashion, he did not mean to include the beneficiary's successor in the gift.

*Dellinger Trust,* 75 D.&C.2d 649 (C.P. Lancaster Co. 1975) was distinguished from *Leffmann Trust.* Ruth C. Dellinger had executed a life insurance trust, one-half of which was to be distributed to the Lancaster Tennis Club upon the death of the income beneficiary. The trust instrument transferred this gift to others, however,

if the Lancaster Tennis Club "is no longer in existence at the time of distribution." Before distribution, the Lancaster Tennis Club, a nonprofit corporation, filed articles of merger with the Lancaster County Riding Club to become the Lancaster County Riding and Tennis Club. The court, in holding that the gift continued to the merged club, contrasted the settlor's unmodified word, "existence," with the terminology of *Leffmann Trust,* "separate corporate existence."

"In *Leffmann,* the settlor specifically and definitely established separate corporate existence as a requisite for the continuing receipt of the gift. In *Dellinger* there is no mention of corporate existence and it is not for the court to add words which are not present." *Dellinger Trust, supra* at 654.

The sole criterion for the continued legacy in *Dellinger Trust* was "existence," not the corporate existence of the actual entity. The plan of merger of the two clubs provided for a continuation of the members, the purposes, activities and undertakings performed by the Lancaster Tennis Club, which the court decided was sufficient to maintain the existence of the original beneficiary under the terms of the trust.

In two more recent cases of this nature, the courts permitted distributions to entities into which designated beneficiaries had merged, where both gifts were dependent upon the beneficiaries' existence. The testatrix in *Maulick Estate,* 5 Fid. Rep. 2d 396 (C.P. Philadelphia 1985) divided the residue of her estate among eight charities, adding that "(i)f any of the above organizations named cease to exist, my executors, in their sole discretion, may pay the share of the organization ceasing to exist, to a like tax-exempt charity preferably one located in Philadelphia and of the same nature of the one ceasing to exist." The court awarded the share

allocated to the Philadelphia Association For the Blind Inc. to its successor in interest by virtue of two successive mergers, Associated Services for the Blind. Inasmuch as the successor organization still provided services to the blind and the visually impaired in Philadelphia, the court declared that "it cannot be said that the named beneficiary has ceased to exist within the meaning of ... the will." *Id.* at 397.

Finally, the decedent in *Estate of Nesbitt,* 438 Pa. Super. 365, 652 A.2d 855 (1995) bequeathed a substantial sum in trust to Nesbitt West Side Hospital "so long as it exists as a separate institution caring for the sick and injured." The hospital merged with another hospital into a new corporation but retained its separate facility furnishing medical care. The merger documents specified that the trust funds would continue to be used only for Nesbitt Hospital after the merger. The Superior Court held that the purpose of the trust was not frustrated by the merger but, instead, had been perpetuated, entitling the hospital to the continuing benefit of the trust.

In the case before us, the beneficiaries are disqualified if they "become dissolved" or "cease to operate," language which is very similar to that used in *Davis Trust* and *Arnold's Estate* and comparable to the general language employed in *Dellinger Trust, Maulick Estate* and *Estate of Nesbitt.* The decedent here did not mandate the beneficiaries' "separate corporate existence," as did the decedent in *Leffmann Trust.* Her words do not demonstrate an interest in the beneficiaries' precise corporate association.

According to the fifth edition of Black's Law Dictionary, "dissolve" means "to terminate, abrogate, cancel, annul or disintegrate." The unabridged version of Webster's Third New International Dictionary defines "dissolve" as "to cause to disperse or disappear, get

rid of, do away with, destroy." Webster's defines "operate" as "to perform a work or labor." In short, based upon the words used by the decedent, the inquiry is whether the churches are still in existence and working. The further inquiry, then, is whether they are continuing to fulfill the purposes of the trust.

The facts as stipulated reveal that both beneficiary churches still function in the consolidated unit. We agree with the reasoning of *Davis Trust* and *Arnold's Estate.* The consolidation did not truly dissolve either church. The members of each church became members of the new church. The fact that a few members left the new congregation is not significant, nor is the fact that a new edifice was acquired. Most importantly, the Quakertown United Methodist Church, pursuant to the express purposes of the plan of consolidation, carries on the religious, charitable, literary and educational pursuits of its member churches. The new church furthers the decedent's charitable intent, which is clearly derived from her will leaving the bulk of her residuary estate to religious affiliations.

We must reject the other five beneficiaries' entreaty to employ the doctrine of *cy pres* to promote the decedent's alleged intent. The courts in their discretion may apply *cy pres* to as nearly as possible effectuate a decedent's intent only when the decedent's charitable purposes are frustrated or impractical. *Bodine Trust, supra;* 20 Pa.C.S. §6102. The decedent's charitable purposes have not been frustrated by the consolidation of the two churches, so we may not apply the doctrine of *cy pres* in this instance.

In isolation, the position of the five beneficiaries opposed to the continuing gift seems logical. They contend that the decedent intended to benefit seven separate entities, and, now that two have become one, she would

not have intended the new, singular entity to receive a double benefit. Their position, however, is not supported by the words chosen by the decedent in her will nor, ultimately, by law. The intent of the decedent, as expressed by the language of her will, is paramount. *Estate of Nesbitt, supra.* The "Evangelical United Brethren Church at Quakertown" and the "Methodist Episcopal Church at Quakertown" have not become dissolved nor ceased to operate within the meaning of the decedent's will. They continue to perform the religious functions the decedent intended as the Quakertown United Methodist Church, which is entitled to receive their two-sevenths income interest in the decedent's residuary trust.

The second issue for disposition is the attorney's fee payable to Mr. DiQuinzio by the estate. We are very familiar with this area of the law.

"It is fundamental that an attorney seeking compensation from an estate has the burden of establishing facts which show that he or she is entitled to such compensation." *In re Estate of Sonovick,* 373 Pa. Super. 396, 400, 541 A.2d 374, 376 (1988). The test for determining the propriety of a fee for legal services in an estate is reasonableness. *In re Estate of Burch,* 402 Pa. Super. 314, 586 A.2d 986 (1991). Such reasonable compensation must be based upon actual services rendered. *In re Estate of Preston,* 385 Pa. Super. 48, 560 A.2d 160 (1989). In assessing the proper fee, we must consider many factors, including the amount of work performed, the character of the services rendered, the difficulty of the problems involved, the amount of money or value of the property in question, the degree of responsibility incurred, the professional skill and standing of the attorney in his profession, the results he was able to obtain and the ability of the client to

pay a reasonable fee. *LaRocca Estate,* 431 Pa. 542, 246 A.2d 337 (1968). The goal is what is fair and reasonable under the circumstances. *In re Estate of Burch, supra.*

Mr. DiQuinzio faced a tremendous challenge in this matter, and he discharged his duties responsibly. With questionable records, he prepared and revised an account for an estate which had been ongoing for almost 25 years. The gross estate of over $200,000 had been largely dissipated by the time of Mr. DiQuinzio's retention. Mr. DiQuinzio worked assiduously to bring this case to a conclusion, despite the administrator's lack of co-operation. We have no doubt that he spent every minute itemized on his bill. We recognize that a lot of Mr. DiQuinzio's work was necessitated by the administrator's wrongdoings, and the estate is not liable for the time spent by Mr. DiQuinzio in defending the administrator's private interests against the beneficiaries' justified objections. *In re Estate of Pitone,* 489 Pa. 60, 413 A.2d 1012 (1980). Nonetheless, we are convinced that the estate would not have recovered the $130,000 from the administrator and his bonding company without the able assistance of Mr. DiQuinzio. He is entitled to a fair compensation, based upon the going rate for such services in Bucks County at the time of his involvement. We set his reasonable fee at $12,500, which the now-augmented estate has the ability to pay, in addition to the $2,750 paid to the prior attorneys.

The last question before us is whether the estate should pay the counsel fees of the objecting beneficiaries. All of the residuary beneficiaries were represented by counsel of their choice.

The general, "American" rule is that each party to adversary litigation is required to pay his or her own counsel fees. *Jones v. Muir,* 511 Pa. 535, 515 A.2d

855 (1986); *Estate of Wanamaker,* 314 Pa. Super. 177, 460 A.2d 824 (1983) and the cases cited therein. In the absence of a statute allowing counsel fees, recovery of such fees will be permitted only in exceptional circumstances. One of the exceptional circumstances in which counsel fees may be recovered is where the work of counsel has created a fund for the benefit of many. *Estate of Wanamaker, supra* at 179, 460 A.2d at 825. This rule was stated by the U.S. Supreme Court in *The Boeing Co. v. Van Gemert,* 444 U.S. 472 (1980) and quoted in *Estate of Wanamaker, supra,* as follows:

"[A] litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole. ... The common-fund doctrine reflects the traditional practice in courts of equity ... and it stands as a well-recognized exception to the general principle that requires every litigant to bear his own attorney's fees. ... The doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense." (citations omitted) *The Boeing Co. v. Van Gemert, supra,* at 478, as quoted by *Estate of Wanamaker, supra* at 180, 460 A.2d at 825. See also, *Couy v. Nardei Enterprises,* 402 Pa. Super. 468, 587 A.2d 345 (1991).

Here, all the parties who benefited from the $130,000 fund obtained were represented by counsel. From the record, the attorneys' contributions were substantially the same. Thus, no party was unjustly enriched at the expense of another, and the common-fund theory is irrelevant to the matter at hand. See *Estate of Wanamaker, supra* at 183-184, 460 A.2d at 825. Each beneficiary shall pay its own counsel fees, without reimbursement by the estate.

## CONCLUSIONS OF LAW

(1) The court has jurisdiction over the parties to this matter and its subject matter.

(2) Bethel United Methodist Church, formerly Bethel Evangelical United Brethren Church or the "Evangelical United Brethren Church at Quakertown" and First United Methodist Church of Quakertown, formerly Quakertown United Methodist Church or the "Methodist Episcopal Church at Quakertown" did not become dissolved or cease to operate, within the meaning of the decedent's will, as the result of their consolidation into the Quakertown United Methodist Church.

(3) The Quakertown United Methodist Church is entitled to receive two-sevenths of the income of the residuary trust created by the decedent's will.

(4) The reasonable fee payable by the estate to attorney P.J. DiQuinzio for his services rendered is $12,500.

(5) The estate is not liable for the beneficiaries' attorney's fees, and each beneficiary shall pay its own fees.

We enter the following:

## DECREE NISI

And now, March 29, 1995, it is hereby ordered and decreed that the trustee of the trust established under item 29 of the will of Clara H. Stover, deceased, shall pay two-sevenths of the net income of said trust at least annually to the Quakertown United Methodist Church. The trustee shall pay $12,500 to P.J. DiQuinzio, Esquire. Each beneficiary shall be responsible for the payment of its own attorney's fees. If no exceptions are filed hereto within 10 days of this date, the clerk shall enter this decree nisi as the final decree.